IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENISE WILSON,

                      Plaintiff,

      v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

                      Defendant.

No. 3:15-cv-00691-HZ

OPINION & ORDER

Bruce W. Brewer
Law Offices of Bruce W. Brewer, PC
P.O. Box 421
West Linn, OR 97068

      Attorney for Plaintiff

//

//

1 - OPINION & ORDER

Billy J. Williams
United States Attorney, District of Oregon
Janice E. Hébert
Assistant United States Attorney
United States Attorney's Office
1000 S.W. Third Avenue, Ste. 600
Portland, OR 97201

John C. Lamont
Special Assistant United States Attorney
Social Security Administration
SSA Office of General Counsel
701 5th Avenue, Suite 2900
Seattle, WA 98104

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Denise Wilson brings this action under the Social Security Act ("Act"), 42

U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of the Commissioner of Social Security's

final decision denying her application for disability insurance benefits ("DIB") under Title II of

the Act and supplemental security income ("SSI") under Title XVI of the Act. Because the

Administrative Law Judge ("ALJ") failed to provide legally sufficient reasons for discounting

evidence from one of Wilson's treating physicians, failed to give clear and convincing reasons

for discounting Wilson's credibility, and erred in evaluating whether Wilson could perform her

past relevant work, the Commissioner's decision is reversed and this case is remanded for further

administrative proceedings.

## BACKGROUND

      Wilson has applied for benefits under the Act several times. Her first application in 2001

alleged that she was disabled due to "migraine headaches; cervical, thoracic, and lumbar pain;

right hip, arm, and shoulder pain; left shoulder and leg pain; and left foot drop." Tr. 95 (punctuation altered). An ALJ denied her claim in 2003, and subsequent review by the U.S. District Court for the District of Montana and the U.S. Court of Appeals for the Ninth Circuit affirmed the Commissioner's decision. Wilson v. Barnhart, 204 F. App'x 639 (9th Cir. 2006).

Wilson filed again for benefits in June and August of 2010, but after the Commissioner denied her claims on initial review, she re-applied (rather than seeking further administrative review) in April of 2011. Tr. 12, 317–330, 381. Wilson alleged a similar set of impairments as her previous applications: "[n]eck pain, leg drop foot, nerve damage, and migraines." Tr. 385. The Commissioner denied her 2011 application initially and after reconsideration. Tr. 104–16. After a hearing in April of 2013, ALJ Riley J. Atkins found Wilson was not disabled. Tr. 107– 16. Wilson appealed, and the Appeals Council remanded because the ALJ erred by failing to explain "which findings from the prior [2003] decision remain binding and which do not[,] as required by Acquiescence Ruling 97-4(9)." Tr. 12. ALJ Atkins held a second hearing with Wilson, and issued a new decision on October 29, 2014, in which he concluded that Wilson was not disabled because should could return to her past relevant work. Wilson again asked the Appeals Council to review the ALJ's decision, but the Appeals Council denied her request, making ALJ Atkins's 2014 decision the Commissioner's final decision that Wilson now challenges in this Court. Tr. 1–5.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. See Valentine

v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). Each step is potentially dispositive. At step one, the presiding ALJ determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; if not, the analysis continues. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the ALJ determines whether the impairment meets or equals one of the impairments listed in the SSA regulations and deemed "so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis moves to step four. 20 C.F.R. §§ 404.1520(d), 416.920(d). At step four, the ALJ determines whether the claimant, despite any impairments, has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his or her past relevant work, the analysis moves to step five where the ALJ determines whether the claimant is able to do any other work in the national economy considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f); Tackett v. Apfel, 180 F.3d 1094, 1098–1100 (9th Cir. 1999). If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g).

//

## ALJ DECISION

The ALJ found that Wilson met the insured status requirement under the Act through December 31, 2014. Tr. 15. At step one, the ALJ found Wilson had not engaged in substantial gainful activity since December 30, 2009, her alleged onset date. Tr. 15. At step two, the ALJ found Wilson had "the severe impairments of degenerative disc disease at the cervical, thoracic, and lumbar levels; status post cervical spine fusion in 2001; arthritis of the right shoulder; and migraine headaches." Tr. 16. At step three, the ALJ found Wilson's impairments or combination of impairments did not meet or equal the severity of any listed impairments. Tr. 16–17. The ALJ next found that Wilson had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work, with the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and or walk 6 hours in an 8 hour workday; sit without limitation in an 8 hour workday; no overhead work requiring or involving lifting or greater than 5 pounds; avoiding concentrated exposure to extreme cold, vibration, and environmental irritants such as noxious gases and fumes.

Tr. 17. At step four, the ALJ found that Wilson was "capable of performing past relevant work as an assistant manager of an adult foster home, DOT 309.354-010, light and semiskilled SVP5, and as a home health worker, DOT 354.377-014, medium and semiskilled SVP3, and actually performed in the sedentary range of exertion (sic)." Tr. 22. "This work," the ALJ continued, "does not require the performance of work-related activities precluded by [Wilson's] residual functional capacity[.]" Tr. 22. Accordingly, the ALJ found that Wilson was not disabled. Tr. 23.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the decision. Andrews, 53 F.3d at 1039–40. A reviewing court must consider the entire record as a whole and cannot affirm the Commissioner by simply isolating a specific quantum of supporting evidence. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) (citation omitted).

## DISCUSSION

Wilson raises the following challenges to the ALJ's decision:

1. Whether the ALJ's conclusion that her mental impairment were not severe at step two is supported by substantial evidence;
2. Whether "changed circumstances" between Wilson's 2003 and 2013 applications supported a less restrictive RFC in 2013;
3. Whether the ALJ properly considered and discounted medical opinion evidence from two of Wilson's treating physicians;
4. Whether the ALJ gave sufficient reasons for discounting Wilson's credibility; and
5. Whether the ALJ's conclusion that Wilson could return to her past relevant work is supported by evidence.

The Court addresses each in turn below.

### 1. Severity at Step Two

Wilson contends that the ALJ erred at step two by concluding that her mental impairments were not severe. Pl. Brief at 19–20. Wilson claimed that she suffered from depression, posttraumatic stress disorder, personality disorder, and substance abuse. Tr. 16. The ALJ found those impairments were "medically determinable" but that they were "nonsevere" because they did "not cause more than minimal limitation in [Wilson's] ability to perform basic mental work activities[.]" Tr. 16. Even assuming the ALJ erred in finding these impairments nonsevere, the error is a harmless one because the ALJ considered the potential effects of

Wilson's mental impairments when evaluating her RFC. <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007) (explaining that an error at step two is harmless where the sequential analysis continues and the ALJ considers a claimant's nonsevere impairments in formulating the RFC); <u>see also</u> Tr. 18–21 (discussing throughout the medical evidence regarding Wilson's claimed mental limitations). Thus, the Court finds no reversible error.

### 2. Changed Circumstances

Wilson attributes error to ALJ Atkins's "changed circumstances" analysis. Pl. Brief at 10–14. The Social Security Act provides that "[t]he findings and decisions of the Commissioner . . . after a hearing shall be binding upon all individuals who were parties to such hearing." 42 U.S.C. § 405(h). The Ninth Circuit recognizes that "[t]he principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." <u>Chavez v. Bowen</u>, 844 F.2d 691, 693 (9th Cir. 1988). Accordingly, an "administrative law judge's findings concerning [a] claimant's residual functional capacity, education, and work experience are entitled to some res judicata consideration in subsequent proceedings." <u>Id.</u> at 694. "In the social security context, a previous finding that a claimant is not disabled creates a presumption of continuing nondisability." <u>Herbert v. Colvin</u>, No. 3:13-CV-01888-BR, 2014 WL 4956448, at *3 (D. Or. Oct. 1, 2014) (quoting <u>Scott v. Colvin</u>, No. 13–CV–1189 W(DHB), 2014 WL 3797491, at *13 (S.D.Cal. Aug.1, 2014). A claimant can overcome the presumption by showing a "changed circumstance" indicating a greater disability. <u>Id.</u> (quoting <u>Scott</u>, 2014 WL 3797491 at * 13). The Commissioner has instructed adjudicators to "adopt [the RFC] from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless

there is new and material evidence relating to such a finding[.]" Acquiescence Ruling ("AR") 97–4(9), 1997 WL 742758 at *3.

In his 2013 decision, ALJ Atkins adopted a less restrictive RFC for Wilson than the ALJ adopted for her in 2003. Tr. 123–24. The Appeals Council concluded that the ALJ Atkins's 2013 decision did not comply with AR 97-4(9) because it did not explain the basis for departing from the 2003 RFC, and it remanded the case to ALJ Atkins to consider and explain, among other things, which of the 2003 findings remained binding. Tr. 123–24. In 2014, ALJ Atkins noted the Remand Order and explained, in accordance with AR 97-4(9), why he adopted a less restrictive RFC in 2013. The ALJ explained that new objective medical evidence demonstrated the absence of neurological symptoms that were the basis of some limitations in 2003. Tr. 22. The ALJ also noted that Wilson's success in treating her back pain with a TENS unit and over-the-counter medication had decreased her use of narcotic medication, and thus restrictions from 2003 that were based on the side effects of those narcotics were no longer necessary. Tr. 22.

Wilson argues the ALJ erred in concluding that new objective evidence of Wilsons's neurological conditions "warrant[ed] the elimination of associated limitations in [Wilson's 2003] residual functional capacity." Tr. 22. The ALJ in 2003 included a limitation that Wilson could only work at a job where she could "frequently alternative positions." Tr. 101. ALJ Atkins did not include such a limitation in Wilson's 2013 RFC because "[n]erve conduction studies of the left upper and lower limbs and need EMG of the left lower limb were normal and there was no EMG evidence of a peripheral neuropathy or a left lumbosacral radiculopathy." Tr. 22. "This objective information," ALJ Atkins wrote, "provides clear support for the current [RFC], demonstrating the absence of neurological factors that would have added limitations to the 2003 [RFC]." Tr. 19.

Wilson asserts that this new EMG study could not possibly represent a "changed circumstance" because Wilson had never undergone an EMG study before. See Pl. Brief at 12 ("In order for a normal EMG to be demonstrative of [changed circumstances] there would have to have been an abnormal EMG in the file at some point prior to the 2003 ALJ decision. Such evidence does not exist."). But overcoming the presumption that attaches to prior RFC findings does not require the ALJ to find directly contradictory evidence in the record; the ALJ must simply find some evidence of a "changed circumstance" that warrants departing from the previous finding. See Herbert, 2014 WL 4956448  at *3 (explaining that the presumption of the validity of prior administrative finding can be overcome by showing a "changed circumstance."). Moreover, the Commissioner instructs ALJs to "adopt [the RFC] from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless **there is new and material evidence relating to such a finding**[.]" AR 97–4(9), 1997 WL 742758 at *3 (emphasis added). The EMG study in this case is new and material evidence, and thus it is sufficient to support the ALJ's adoption of a less restrictive RFC in 2013.

The ALJ's conclusion that Wilson's new RFC did not need to include the 2003 limitations regarding the side effects of narcotic medications is also supported by substantial evidence. Wilson indicated on her 2011 disability report and her appeal report that she was not taking any narcotic medication. Tr. 387–88, 425. Wilson testified that the physician treating her back pain did not prescribe her narcotic medication. Tr. 39. Recent treatment records indicate that Wilson told her doctors she was tolerating her medications without suffering from side effects. Tr. 924, 1154. Thus, the ALJ's conclusion that changed circumstances warranted lifting from the 2003 RFC any limitations related to the side effects of medication is supported by substantial evidence.

The ALJ also noted other factors supporting a departure from the 2003 RFC, including that Wilson's age category had changed, and that one of Wilson's treating physicians recommended that Wilson seek out vocational rehabilitation. As discussed below, the ALJ's interpretation of this physician's recommendation is a rational one supported by substantial evidence in the record. Taken together, along with the reasons discussed above, the Court finds that the ALJ's "changed circumstance" analysis is well-supported and not in error. Although Wilson challenges other aspects of the ALJ's decision on this point, given the multiple, legally sufficient reasons for finding a "changed circumstance" here, any other error would be a harmless one that would not warrant reversal. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

### 3.  Medical Evidence

Wilson asserts that the ALJ erred in evaluating the medical evidence from two of her treating physicians, Dr. Melissa Quisano and Dr. Meg Devoe. Pl. Brief at 14, 18. There are three sources of medical opinion evidence in Social Security cases: treating physicians, examining physicians, and non-examining physicians. Valentine, 574 F.3d at 692 (citing Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830. "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Id. The ALJ can reject the uncontroverted opinion of a treating or examining physician only for "clear and convincing reasons" supported with substantial evidence in the record. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). Even if a treating or examining doctor's

opinion is contradicted by another doctor, the ALJ can reject it only by providing "specific and legitimate reasons" that are supported by substantial evidence. Id.

### a.  Dr. Quisano

In 2010, Dr. Quisano opined that Wilson's neck and lower back pain, along with her migraines caused a "[v]ery significant interference with [her] ability to perform one or more basic work-related activities." Tr. 622. Dr. Quisano then stated that Wilson should be limited to sedentary work. Tr. 622. The ALJ's 2014 decision does not address Dr. Quisano's opinion, and the Commissioner concedes that the ALJ's failure to discuss the weight afforded to Dr. Quisano's opinion was an error. Def. Brief at 12. The Commissioner argues, however, that the error was harmless because the ALJ considered and properly discounted Dr. Quisano's opinion in his 2013 decision.

The Appeals Council vacated the ALJ's 2013 decision because it failed to comply with AR 97-4(9), and remanded the case back to the ALJ with instructions to "issue a new decision" that complied with AR 97-4(9), evaluated Wilson's subjective complaints, and evaluated the treating and nontreating source opinions pursuant to applicable agency regulations. Tr. 124. When faced with a remand order from the Appeals Council, an ALJ sometimes incorporates by reference certain findings from the prior decision. See, e.g., Conejo v. Colvin, No. ED CV 10-706-AS, 2014 WL 4264945, at *9 (C.D. Cal. Aug. 27, 2014); Alsyouf v. Astrue, No. EDCV 11-1867 SS, 2013 WL 327794, at *12 (C.D. Cal. Jan. 29, 2013) ("The most recent ALJ decision incorporated by reference the prior decision."). Such a practice is not necessarily improper. Conejo, 2014 WL 4264945 at *9 (citing Walker v. Astrue, No. EDCV08-971DSF(FFM), 2010 WL 2305849, at *11 (C.D. Cal. June 4, 2010)).

Here the ALJ did not expressly incorporate any findings from the 2013 opinion. Instead, ALJ Atkins explained that, upon remand from the Appeals Council, his task was to "address[] . . . the inconsistent residual functional capacity findings" between the 2003 and the 2013 decisions by including "language explaining which findings from the [2003] decision remain binding and which do not." Tr. 12. By cabining the 2014 analysis in this way, it could be argued that the ALJ impliedly incorporated his 2013 findings, including his conclusions about Dr. Quisano's opinion, into his 2014 opinion because it was not necessary to re-visit Dr. Quisano's report to comply with that portion of the Appeals Council remand order.[1] The Court is not prohibited from drawing reasonable inferences from the ALJ's opinion, Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989), and it would make little practical sense to remand the case to the Commissioner on this point—essentially requiring the ALJ to add one line expressly incorporating the applicable findings from the 2013 opinion.[2]

But even assuming the ALJ properly incorporated his 2013 analysis of Dr. Quisano's opinion into his 2014 decision, the ALJ's analysis is still flawed because he did not provide sufficient reasons for discounting her report in 2013. The ALJ gave "[s]ome weight . . . to Dr. Quisano's opinion, because MRIs of [Wilson's] spine show mild to moderate degenerative disc disease which causes some limitations. However, on examination, [Wilson's] gait is normal and her strength and sensation are also normal, which is inconsistent with a finding [Wilson] is limited to sedentary exertion activity." Tr. 114. Furthermore, the ALJ wrote, Wilson's migraines

---

[1] The Court makes no judgment about whether the ALJ's analysis here actually complied with the Appeals Council remand order. A remand order is not a "final agency action," and thus the Court does not have jurisdiction to review the ALJ's compliance with it. Schuessler v. Astrue, No. 09-CV-3065-BR, 2010 WL 3326729, at *13 (D. Or. Aug. 23, 2010) (explaining that whether an ALJ complied with a Appeals Council remand order was not subject to judicial scrutiny because the "Court's review . . . is limited to the final decision of the Commissioner rather than prior decisions and orders that may have gone into the creation of that final decision.).
[2] Additionally, the Appeals Council reviewed the ALJ's 2014 decision and did not identify the failure to "re-address" Dr. Quisano's opinion as a reversible error.

appeared to improve with medication because "the record [did] not show the claimant had any complaints of migraines after staring Topamax . . . ." Tr. 114.

There are two problems with the ALJ's reasoning regarding Dr. Quisano's opinion of Wilson's back and neck pain. First, it is not supported by substantial evidence in the record. The ALJ does not cite to any particular medical evidence in the record to support his finding that Wilsons's gait, strength, and sensation are "normal." See Tr. 114. A review of Dr. Quisano's treatment records contradict the ALJ's findings. Dr. Quisano wrote that Wilson's neck was "tender" at nearly every cervical level, and that Wilson exhibited "[d]ecreased [range of motion] especially with backwards movement." Tr. 608. Wilson had "[p]araspinal muscle tenderness along the length of her spine," and that she had "[d]ecreased [range of motion] with forward and backward flexion. Tr. 609. Wilson had a "[s]lightly antalgic gait, but [did] not favor one side." Tr. 609. She had "grossly normal sensation," and "5/5 muscle strength [in her] upper and lower extremities," but had "some give-away weakness due to pain."

Second, even assuming there is other evidence in the record showing that Wilson's gait, sensation, and strength were "normal," the ALJ does not explain how such evidence undermines Dr. Quisano's opinion that Wilson's back pain limited her to sedentary work. That she may have performed within a "normal" range on these brief tests does not necessarily mean she is capable of performing at a job above the sedentary exertion level, which may require her to be on her feet for up to six of eight hours per day. See 20 C.F.R. § 404.1567 (noting that a job is in the "light work "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

The ALJ's conclusions about Wilson's migraines are similarly not supported by substantial evidence in the record. The ALJ wrote that "[c]ontrary to [Wilson's] testimony of

continued migraines on Topamax, the record does not show the claimant had any complaints of migraines after starting Topamax prophylactically." Tr. 114. The ALJ cites to a collection of Wilson's medical record from March of 2013, and it is true that these records do not reflect that Wilson suffered from migraines while taking Topamax. Tr. 789–801. However, just two months later, Wilson reported that "Topamax does not help migraines." Tr. 1066. The next day, on May 9, 2013, she reported that she had been suffering from a migraine for three days. Tr. 1061. A week later she still had the migraine. Tr. 1057. All the while, she was taking 100 milligrams of Topamax daily. E.g., Tr. 1065. Doctors instructed her to increase her dose to 100 milligrams twice daily, and on June 14, 2013, Wilson reported that her migraines had improved. Tr. 1046. In September of that year, Wilson was still taking  200 milligrams of Topamax daily, but again reported to her doctor complaining of three-day long migraine. Tr. 1013. Two weeks later, she reported a "severe migraine," and doctors increased her dose to 200 milligrams up to twice daily. Tr. 998. Then again in May of 2014, Wilson report another multiple day migraine. Tr. 943. This evidence contradicts the ALJ's conclusion that there was no evidence that Wilson had a migraine after starting Topamax.

### b.  Dr. Devoe

Next, Wilson attributes error to the ALJ's interpretation of a statement from her primary treating physician, Dr. Meg Devoe. In a chart note from a visit in May of 2014, Dr. Devoe wrote in her instructions to Wilson to "[p]lease check out vocation rehab services or Employment Access services at CCC." Tr. 1097. "This comment," the ALJ wrote, "clearly indicates that the physician wants [Wilson] to get vocational training and seek work. Consequently, it is also clear that she does not consider the claimant to be disabled. This information is given great weight." Tr. 21. Wilson "objects to the ALJ's treatment" of Dr. Devoe's statement. Pl. Brief at 18. Dr.

Devoe "did not opine that Wilson can work full time," but rather she "suggested that vocational rehabilitation might be beneficial or that [Wilson] might avail herself of employment access services at CCC." Pl. Brief at 18. "This is not," Wilson argues, "a release to full time employment." Pl. Brief at 18.

The ALJ analyzed Dr. Devoe's recommendation that Wilson seek vocational rehabilitation as part of a collection of evidence that Wilson submitted after the hearing. Tr. 20–21. The ALJ reviewed this new evidence, which included questionnaires completed by Dr. Devoe. On the questionnaires, the ALJ explained, Dr. Devoe indicated that Wilson could "occasionally lift and carry 10 to 15 pounds and frequently lift and carry 5 to 10 pounds, and . . . that there are no clear limitations on how long the claimant is able . . . to stand, and walk or sit" in an eight-hour work day. Tr. 20. The ALJ noted that Dr. Devoe "[c]uriously . . . advises deferring to mental health for this information" about Wilson's physical limitations. Tr. 20. The ALJ examined the related mental health records and the opinion of Wilson's mental health treatment provider, and correctly found that there was no relevant information about Wilson's physical limitations in those records. Tr. 20–21. Then, the ALJ analyzed Dr. Devoe's recommendation to Wilson that she "check out vocational rehab services," and concluded that "it is . . . clear that [Dr. Devoe] does not consider the claimant to be disabled." Tr. 21. When viewed in this context, the ALJ's interpretation of Dr. Devoe's recommendation to seek vocational rehabilitation as indicative of the doctor's belief that Wilson was not disabled is supported by substantial evidence, and therefore the Court finds no error. It is certainly plausible that the statement from Dr. Devoe could be interpreted differently, but the ALJ's conclusion is supported by "inferences reasonably drawn from the record," and thus the Court is bound to uphold it. Rounds v. Comm'r, 807 F.3d 996, 1002 (9th Cir. 2015) ("[I]f the evidence is

susceptible to more than one rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").

### 4. Wilson's Credibility

Wilson next asserts that the ALJ gave insufficient reasons for rejecting her subjective complaints about the intensity, persistence, and limiting effects of her symptoms. An ALJ analyzes the credibility of a claimant's testimony regarding her subjective pain and other symptoms in two steps. Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (citation and internal quotation omitted). "The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (citation and internal quotation omitted). Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject her testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. Id. (citation and internal quotation omitted).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. Smolen v. Chater, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements by the claimant. Id.

At step one, the ALJ found that Wilson's "medically determinable impairments could be expected to cause some of the alleged symptoms." Tr. 18. The ALJ found at step two that

Wilson's statements about the intensity and limiting of effects of his symptoms were not entirely credible. Tr. 19. The ALJ noted that Wilson had some success in the past treating her back pain with a TENS unit. [3] She first began using a TENS unit in 2002 to treat her back pain, with good results. Tr. 18. However, that unit was stolen and in the interim, Wilson lost her job and her health insurance, and could not afford to purchase a new unit. Tr. 52, 54. Wilson eventually secured insurance and got a new TENS unit in 2014, though she testified that the new unit "has not helped with the pain." Tr. 18. At the hearing, she explained that she was only able to use two pads instead of the full four pads, because someone had apparently stolen one of the unit's wires. Tr. 18. The ALJ noted Wilson's trouble with the wires, but concluded that Wilson had "been using [the TENS unit] effectively for the past several weeks." Tr. 18. The ALJ does not cite to any evidence in the record that the TENS unit was working "effectively" in the weeks leading up to the hearing, and, in fact, Wilson's testimony contradicts the ALJ's conclusion:

> BY THE CLAIMANT'S ATTORNEY:
> Q: [A]nd has [the new] TENS unit helped with your pain?
> A: No, it hasn't.
> . . .
> BY THE ALJ:
> Q: There is a reference in the more recent records that your weren't using it because it didn't have a wire attached to it.
> A: Right.
> Q: When did you get the wire?
> A: A couple weeks ago.
> . . .
> Q: It's not operational without the wire?

---

[3] A Transcutaneous Electrical Nerve Stimulation (TENS) unit is a small, hand-held battery operated device that when activated administers a continuous mild electrical charge to stimulate muscles. TENS units are used to treat chronic pain. Thompson v. Lampert, No. CV-02-135-HU, 2004 WL 1673102, at *1 (D. Or. July 27, 2004), report and recommendation adopted, No. CIV. 02-135-HU, 2004 WL 2059523 (D. Or. Sept. 14, 2004) (citing The Merck Manual of Diagnosis & Therapy 1370 (Mark H. Beers & Robert Berkow eds., 17th ed.1999).

A: No I had two wires. One was stolen off it. So it was operational with
   one wire, but you can operate it with two wires and have four pads
   . . . . So I had only one wire, but two pads were running. I could have
   four pads running.
Q: Which is not the way you normally use it; is that what you're saying?
A: Yes, I usually run it with four pads.
Q: So from January to June, did you have the four pads? You had both
   wires?
A: Yes.
Q: Okay. Was the TENS Unit helping then?
A: A little bit, but not like my old one. It's different.

Tr. 39–40. Even when she had both wires, Wilson testified that the new unit was not as effective

as the unit she used in 2002. The ALJ's conclusion about the TENS unit's effectiveness is not

supported by substantial evidence and thus cannot be a legitimate reason for discounting

Wilson's credibility.

The ALJ also noted that "[t]he records also showed the claimant using minimal narcotic

pain medication." Tr. 18. The cited medical record does, in fact, reflect that Wilson was treating

her back pain and migraines with ibuprofen. Tr. 818. And while treating a condition with over-

the-counter medication could be a legitimate reason to discount Wilson's credibility, the ALJ did

not mention that Wilson was apparently taking 1000–2000 milligrams of ibuprofen two to three

times per week to treat her symptoms. Tr. 812. Wilson told her doctors that she used such high

doses of over-the-counter medication in part because she lost her insurance and could not afford

the more effective prescription medication for her migraines. Tr. 812. When Wilson reported to

the emergency room in November of 2012 complaining of bloody stools, doctors suspected that

her long term, high-dose use of ibuprofen could have given her "colonic ulcers" that caused the

bleeding. Tr. 828. Doctors then instructed her to avoid NSAIDS like ibuprofen altogether. Tr.

821. The ALJ did not mention this evidence, much less explain how the full context of Wilson's

ibuprofen use undermined the credibility of her claims about her back pain or migraines. This too is not a clear and convincing reason for discounting Wilson's claims.

The ALJ mentioned that Wilson claimed to walk three times a week, and that "this reported level of activity is inconsistent with the hearing testimony, but supported by the objective evidence." Tr. 21. Again, this conclusion is not supported by the record. The only hearing testimony about walking is from 2013. Tr. 43, Tr. 64. The ALJ asked if Wilson has difficulties walking, and she said she did on most days. Tr. 64. Wilson claimed to be able to walk about a block before her back pain flared, and that three blocks was about the limit of her ability to walk. Tr. 64. The testimony then moves on to Wilson's difficulty lifting or carrying items. Tr. 64–65. There is no mention about the number of times she walks per week. The ALJ's mischaracterization of Wilson's testimony is obviously not a clear and convincing reason for discounting her credibility.

Finally, the ALJ found that "[t]he majority of emotional problems addressed are not mental health issues but unfortunate or unwise lifestyle choices." Tr. 19. On June 14, 2013, the ALJ found a treatment record where Wilson "reported the new problem of depression and anxiety, as well as fatigue, malaise, headache, and difficulty sleeping after an assault in her apartment building where a man grabbed her and started kissing her." Tr. 19. "The comments of [Wilson's] mental health provider . . . included indications that some of these problems are the result of claimant behavior." Tr. 19. The ALJ then notes another treatment record which reported "self-harm as life style; poor choices, blaming, poor self-care, violent relationships, . . . does not take responsibility for behaviors, past significant and current trauma, intimate partner violence present and past, lonely, acts out, no healthy relationships, and poor choices lead to bad situations." Tr. 19, Tr. 965. The ALJ fails to explain how any of the facts about Wilson's

"lifestyle choices" are relevant to analyzing the credibility of her testimony regarding her symptoms and limitations. Whatever the source of her mental and emotional stress, the ALJ points to no evidence suggesting that Wilson did not actually suffer from the symptoms she claimed, or that Wilson is exaggerating the limiting effects that her mental symptoms have on her ability to work. Thus, the ALJ's "lifestyle choice" rationale is not a convincing reason for discounting Wilson's credibility.

The Commissioner points to other portions of ALJ's decision that could support an adverse credibility finding, such as a passing reference to a job application Wilson completed, or that the ALJ seemed to suggest that the objective medical evidence was inconsistent with Wilson's testimony. Def. Brief at 15–16. But the Court declines to uphold the ALJ's credibility findings on those grounds, because the ALJ did not even attempt to apply any reasoning to these facts in assessing Wilson's credibility. See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.") (citation omitted). For instance, the ALJ noted that Wilson "often exhibits decreased range of motion in all direction due to pain, reports significant physical deficits." Tr. 18. The ALJ then summarized some medical imaging evidence that did not reveal any acute physical injury. Tr. 18. "The precipitating event," the ALJ wrote, "was that [Wilson] here 55 years of age, had tripped when playing tag with her boyfriend and others." Tr. 18. The ALJ does not explain the significance of these facts, and the Court is left to speculate about how the ALJ believes they bear on Wilson's credibility. While the Court can draw reasonable inferences from an ALJ's opinion, the ALJ's

passing reference here to a small collection of records from a single emergency room visit is not sufficient to infer anything about the ALJ's reasoning regarding Wilson's credibility.

In sum, the ALJ erred by failing to provide clear and convincing reasons for discounting Wilson's credibility.

### 5. Past Relevant Work

Finally, Wilson asserts that the ALJ erred at step four in concluding that Wilson was capable of performing her past relevant work as an assistant manager of an adult foster home and as a home health worker, both as those jobs are generally performed in the national economy and as Wilson actually performed them. Tr. 22–23. At step four of the sequential analysis, the claimant has the burden to prove that she cannot perform her past relevant work "either as actually performed or as generally performed in the national economy." Carmickle v. Comm'r, 533 F.3d 1155, 1166 (9th Cir. 2008). Although the burden lies with the claimant here, the ALJ still has a duty to make the requisite factual findings to support a conclusion that the claimant is capable of performing his or her past work. Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citations omitted). This is done by looking at the claimant's RFC and the physical and mental demands of the claimant's past relevant work. Id. at 844–45 (citations omitted). The claimant must be able to perform:

1. The actual functional demands and job duties of a particular past relevant job; or
2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

Id. at 845. This determination requires "specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work." Id. Social Security Regulations name two sources of information that may be used to define a claimant's past relevant work as actually performed:

a properly completed vocational report, and the claimant's own testimony. Id. at 845 (internal

citations omitted). The Dictionary of Occupational Titles ("DOT") is the best source for how a

job is generally performed. Rickman v. Colvin, No. 6:12-CV-01201-SI, 2013 WL 4773627, at

*10 (D. Or. Sept. 4, 2013) (citing Carmickle, 533 F.3d at 1166).

      The Commissioner concedes that the "evidence does not support the ALJ's conclusion

with respect to Wilson's ability to return to work as a home health worker or to return to work as

a[n] adult foster home assistance manager as she actually performed it." Def. Brief at 7. Thus,

the only question is whether the ALJ supported with substantial evidence his conclusion that

Wilson could return to her work as an assistant manager for an adult foster home as that work is

generally performed.

      The vocational expert testified at the 2013 hearing that Wilson's job as an "assistant

manager for an adult foster care home" matched with DOT code 309.354-010. Tr. 70. The ALJ

then posed a hypothetical to the VE based on Wilson's RFC, and the VE testified that "[t]he

prior work activity that would be consistent with [the ALJ's] hypothetical based on the DOT and

the claimant's description would be assistant manager of an adult foster care facility." Tr. 71.

      The DOT code the VE relied on describes the job of "Homemaker" and includes the

following work tasks:

> Advises family in private home in dealing with problems, such as nutrition,
> cleanliness, and household utilities: Advises and assists family members in
> planning nutritious meals, purchasing and preparing foods, and utilizing
> commodities from surplus food programs. Assists head of household in training
> and disciplining children, assigns and schedules housekeeping duties to children
> according to their capabilities, and encourages parents to take interest in
> children's schoolwork and assist them in establishing good study habits. Explains
> fundamental hygiene principles and renders bedside care to individuals who are
> ill, and trains other family members to provide required care. Participates in
> evaluating needs of individuals served, and confers with Caseworker (social ser.)
> to plan for continuing additional services.

22 - OPINION & ORDER

DOT 309.354-010, 1991 WL 672663.

Wilson asserts that the ALJ erred because the "Homemaker" job title listed at the DOT code does not match the job title of Wilson's relevant work as an assistant manager of an adult foster home. The thrust of the analysis at this step is not simply a "blind matching of job titles." Mills v. Sullivan, 804 F. Supp. 1048, 1056 (N.D. Ill. 1992). Rather, the question is whether the claimant's job duties are consistent with the job duties described in the DOT, such that the ALJ can rely on the DOT to determine whether the claimant can perform her past work as generally performed in the national economy. See Otto v. Comm'r Soc. Sec. Admin., No. 3:14-CV-01028-MA, 2015 WL 4066684, at *8 (D. Or. July 2, 2015) (examining whether the job duties listed for a DOT code, whose job title did not match plaintiff's job title, were sufficiently similar to the type of work the plaintiff performed at past job to support the ALJ's step four finding); Scansen v. Comm'r Soc. Sec. Admin., No. 6:12-CV-00992-MA, 2013 WL 3754853, at *6 (D. Or. July 15, 2013) (comparing job duties in DOT to claimant's work history and testimony to determine if ALJ's conclusion regarding plaintiff's past relevant work was supported by substantial evidence).

Wilson described her job duties at the adult foster home as follows: "meds, cook, clean, dress, bathe (sic)." Tr. 395. The job required her to walk or stand for eight hours, and did not involve any lifting. Tr. 50, 395. There is some overlap between Wilson's description of her job and the "Homemaker" code above, but the ALJ's conclusion that the "Homemaker" is a description of how Wilson's job was generally performed in the national economy is not supported by substantial evidence.

Although Wilson's description of her job is lacking in detail, even a cursory review of Wilson's work history reveals that the vast majority of her work in the fifteen years prior to her

alleged onset date was in the medical field, including stints as a certified nursing assistant, and a medication aide. Tr. 393. The VE recognized this when matching the DOT job titles to Wilson's other work— he listed Nurse Assistant, DOT 355.674-014, Home Health Aide, DOT 354.477-014, and Medication Aide, DOT 355.374-014. Tr. 69–70.

The description Wilson gave of her job at the adult foster home, when viewed in context of the record as a whole, strongly suggested that job was also in health care and was similar in many respects to the CNA or "Nurse Aide" position she previously held. Compare Tr. 395 (wherein Wilson describes her job at the foster home as "meds, cook, clean, dress, bathe (sic).") with DOT 355.674-014 Nurse Assistant ("Performs any combination of following duties in care of patients in hospital, nursing home, or other medical facility[:] . . . Bathes, dresses, and undresses patients. Serves and collects food trays and feeds patients requiring help. Transports patients, using wheelchair or wheeled cart, or assists patients to walk. Drapes patients for examinations and treatments, and remains with patients, performing such duties as holding instruments and adjusting lights. Turns and repositions bedfast patients, alone or with assistance, to prevent bedsores. Changes bed linens, runs errands, directs visitors, and answers telephone. Takes and records temperature, blood pressure, pulse and respiration rates, and food and fluid intake and output, as directed. Cleans, sterilizes, stores, prepares, and issues dressing packs, treatment trays, and other supplies. Dusts and cleans patients' rooms. . . .").

The Homemaker code, by contrast, describes a dramatically different job. The only arguably "health care" related duty in the Homemaker description is "explain[ing] fundamental hygiene principles and render[ing] bedside care to individuals who are ill, and trains other family members to provide required care." The other parts of the Homemaker job deal primarily with family social dynamics and child rearing. The Homemaker's primary duties as described

encompass a largely "advisory" or training role, and the evidence about Wilson's job, while limited, suggested a much stronger emphasis on actually performing tasks rather than directing others to perform them. Finally, a substantial number of the Homemaker duties are related to children and child care, while Wilson's job was at an adult foster home.

Neither the VE nor ALJ even mentioned that the DOT code they relied on to match the adult foster home job was for "Homemaker," or offer any explanation for the decision to use a non-health care code to describe a job for a person who had only worked in the health care field for over a decade. To the extent that there was some ambiguity about what Wilson's job at the adult foster home actually entailed, it was the ALJ's duty to further develop the factual record on that point. See Pinto, 249 F.3d at 844 (explaining that is the ALJ's "duty to make the requisite factual findings to support a conclusion that the claimant is capable of performing his or her past work."). Therefore, the ALJ erred by relying on the "Homemaker" entry in the DOT to evaluate whether Wilson could return to her past relevant work.

**6. Remand**

Having established that the ALJ committed legal error in analyzing the medical evidence, discounting Wilson's credibility, and at step four, the final question is whether to remand for additional proceedings or an award of benefits. Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded," but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted); Banks v. Colvin, No. 3:14-CV-01306-HZ, 2015 WL 4628031, at *6 (D. Or. Aug. 3, 2015) (quoting Treicher v. Comm'r, 775 F.3d 1090, 1101 (9th Cir. 2014)).

Wilson asks that the Court remand her case for further proceedings, and the Court finds that such a remand is appropriate here. Skelton v. Comm'r of Soc. Sec., No. 06:13-CV-01117-HZ, 2014 WL 4162536, at *14 (D. Or. Aug. 18, 2014) (explaining the question whether to remand for additional proceedings turns on the utility of further analysis) (citing Harman, 211 F.3d at 1178).  It is not clear from the record that Wilson is disabled. Treichler, 775 F.3d at 1103–04 (explaining that a remand for an award of benefits is only appropriate where "the record as a whole is free from conflicts, ambiguities, or gaps, . . . all factual issues have been resolved, and . . . the claimant's entitlement to benefits is clear under the applicable legal rules."). Additionally, the ALJ did not complete the sequential analysis and thus never inquired whether there were jobs in that national economy that Wilson could perform given her limitations. Therefore, a remand for additional proceedings is required.

## CONCLUSION

The Commissioner's decision is reversed and remanded for additional proceedings.


IT IS SO ORDERED.


Dated this _20_ day of _April_____, 2016.

_Marco Hernández_____

MARCO A. HERNÁNDEZ

United States District Judge